581 F.2d 371
 ROBINSON PROTECTIVE ALARM COMPANY, Wells Fargo Alarm
Services, a Division of Baker Protective Services, Inc.,
Honeywell Protection Services, a Division of Honeywell,
Inc., Sheppard Alarm Co., Inc., Burns Electronic Security
Services, Inc., Appellants,
v.
CITY OF PHILADELPHIA, Lennox Moak, Charles Dorfman, Robert
Silver and Edgar P. Grim.
 No. 77-2218.
 United States Court of Appeals,
Third Circuit.
 Argued May 2, 1978.
Decided July 28, 1978.
 
 Steven R. Waxman, Bolger & Picker, Philadelphia, Pa., for appellants.
 Sheldon L. Albert, City Sol., Stewart M. Weintraub, Michael Karasik, and Richard S. Kohn, Asst. City Sol., Philadelphia, Pa., for appellees.
 Before SEITZ, Chief Judge, and VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 Section 9-303 of the Philadelphia Code regulates the construction and use of underground wires beneath the City's streets. Section 9-303(4)(a) provides:
 
 
 2
 "In consideration of privileges granted, every private alarm signal system licensee shall pay to the City, on the 15th of each month, 5% Of his gross earnings, whether collected or not, during the previous month from the exercise, directly or indirectly, of the privileges granted by special ordinance."
 
 
 3
 Central alarm station companies[1] furnish fire and/or burglar alarm services by transmitting signals from their customers' properties to central alarm stations over underground wires. Five such central alarm station companies have obtained, or seek to obtain, a special ordinance from the City of Philadelphia, as required under § 9-303, to operate their services by contracting for the use of existing underground lines maintained by Bell of Pennsylvania. These five central alarm station companies[2] brought suit against the City of Philadelphia[3] in the United States District Court for the Eastern District of Pennsylvania, challenging the collection of moneys under § 9-303(4)(a). The gist of the plaintiffs' complaint is that § 9-303(4) (a) applies only to licensed central alarm stations and not to other similarly situated users of Bell of Pennsylvania's underground wires. The central alarm station companies assert in their complaint that exacting fees from them, but not from other purchasers of Bell of Pennsylvania's services which involve transmissions along underground wires violates the equal protection and due process clauses of the Fourteenth Amendment of the United States Constitution, Article VIII, Section 1, of the Constitution of the Commonwealth of Pennsylvania, and the state's Sterling Act, as amended, 53 P.S. § 15971(a). The complaint prayed for appropriate declaratory, equitable and legal relief.[4]
 
 
 4
 The district court, by bench memorandum and order of July 21, 1977, dismissed plaintiffs' complaint on motion by the defendants on the ground that the Tax Injunction Act, 28 U.S.C. § 1341 (1976), deprived the court of subject matter jurisdiction. We affirm.
 
 The Tax Injunction Act provides that:
 
 5
 "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."
 
 
 6
 Plaintiffs' appeal from the district court's order of dismissal raises two issues of statutory construction: (1) whether § 9-303(4)(a) of the Philadelphia Code is a tax under State law," and (2) whether the central alarm station companies are afforded a "plain, speedy and efficient" state remedy.[5]I.
 
 
 7
 The central alarm station companies argue that amounts payable pursuant to § 9-303(4)(a) are not taxes under state law and hence suits to restrain their collection are beyond the prohibitory scope of 28 U.S.C. § 1341. The plaintiffs rely on the Pennsylvania Supreme Court's characterization of the nature of payments made under a predecessor City ordinance to § 9-303(4)(a):
 
 
 8
 "But the consideration exacted in the ordinance is neither a tax nor a license fee; it is in the nature of an annual rental to be paid for the privilege of the use of space under the streets . . . ."
 
 
 9
 City of Philadelphia v. Holmes Electric Protective Co., 335 Pa. 273, 278, 6 A.2d 884, 887 (1939). Plaintiffs contend that this state judicial construction of the predecessor ordinance in the context of determining a municipality's immunity from the bar of state statutes of limitation should be binding in determining the application of a federal statute which explicitly restricts the subject matter jurisdiction of federal courts. The issue before us is whether Congress intended that the scope of the Tax Injunction Act's term "tax under State law" be given a uniform construction as a matter of federal law or a variable construction by reference to or incorporation of state law.
 
 
 10
 The Fifth Circuit Court of Appeals considered precisely this issue in Tramel v. Schrader, 505 F.2d 1310 (5th Cir. 1975). In that case the court considered whether 28 U.S.C. § 1341 barred a suit to enjoin the collection of special street improvements assessments which were alleged to be violative of the plaintiff's federal constitutional rights. Texas state courts had defined these special assessments as other than "taxes." Id. at 1314-15. The Tramel court denied any controlling effect to state courts' distinctions between taxes and special assessments. The court reasoned that "(t)he proper question is not what the Texas courts have said the Texas legislature meant when it used the term ('taxes') but what Congress meant when it used the term." Id. at 1315 n.7. The Tramel court deemed it particularly inappropriate to draw on state definitions of taxes in contexts wholly different from the context of the Tax Injunction Act. In light of the particular purposes of the Tax Injunction Act,[6] the Tramel court concluded that the special street improvements assessments were the type of revenue collection Congress intended to insulate from federal court interference and hence were taxes under 28 U.S.C. § 1341.
 
 
 11
 We agree with the approach taken by the Fifth Circuit Court of Appeals in Tramel that the meaning of the term "tax under state law" in 28 U.S.C. § 1341 should be determined as a matter of federal law by reference to congressional policies underlying the Tax Injunction Act, rather than by adoption of state tax labels developed in entirely different legal contexts. The Holmes decision, for example, labelled the City's ordinance as other than a tax in recognition of state policies unrelated to the purposes of the Tax Injunction Act. It is unlikely Congress meant for the federal courts to define the scope of the Tax Injunction Act and their own jurisdiction by adopting state labels from contexts inapposite to application of 28 U.S.C. § 1341.
 
 
 12
 Congress has on a few occasions expressly adopted or incorporated state law with recognition of its variable content to serve as the source of substantive, albeit non-uniform, federal law. But in instances of express incorporation, Congress evidences a particular purpose in conforming federal substantive standards of conduct to those which are applicable locally, while preserving the federal nature of the law for subject matter jurisdiction purposes.[7] For example, the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1970), confers exclusive original jurisdiction in federal district courts over negligence actions against the United States, and calls explicitly for the application of the "law of the place where the act or omission occurred." Similarly, The Assimilative Crimes Act, 18 U.S.C. § 13 (1976), explicitly incorporates state criminal law as the governing federal law in federal enclaves. See United States v. Sharpnack, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). In both statutes Congress explicitly adopted state law as federal law to preserve federal question jurisdiction by means other than enactment of a comprehensive federal tort or criminal code.
 
 
 13
 By contrast, in enacting the Tax Injunction Act, Congress did not intend to conform federal substantive law to state standards of individual conduct. 28 U.S.C. § 1341 is strictly a jurisdictional provision that withholds from federal courts their power to adjudicate certain controversies which might fall within other congressional grants of jurisdiction. The power to withhold from the federal courts original jurisdiction otherwise authorized in Article III is vested in Congress. U.S.Const., Art. III, § 2. Congress' power to implement or limit federal courts' jurisdiction is so fundamental that we decline to infer a congressional intent to leave a jurisdictional provision dependent on state law absent an unambiguous and express incorporation by statute.
 
 
 14
 We do not believe 28 U.S.C. § 1341 expressly and unambiguously incorporates state judicial labels as to what are or are not taxes for purposes of state statutes completely unrelated to the policies of federal jurisdiction. The modifying clause "under State law" should be plainly read to differentiate between state and federal taxes, not to adopt state law labels as to which revenue collections are taxes for state law purposes.
 
 
 15
 Congress intended that the Tax Injunction Act be uniformly applied, consistent with the principles of federalism, comity and non-interference with state fiscal affairs embodied in the Act. See Tully v. Griffin, 429 U.S. 68, 73, 97 S.Ct. 219, 50 L.Ed.2d 227 (1976). These policies have been previously elaborated upon by this court in Garrett v. Bamford, 538 F.2d 63 (3d Cir.), Cert. denied, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976), and by the Fifth Circuit in Tramel. One jurisdictional purpose of the Tax Injunction Act was to deprive out-of-state corporations of an advantage over state taxpayers in being able to threaten localities with protracted injunctive litigation in federal courts which induced the localities to compromise their tax claims. In-state taxpayers usually had to pay their disputed taxes and sue for a refund in state court. Congress intended that the Tax Injunction Act withdraw access to federal court by foreign corporations relying solely on diversity jurisdiction to resist state and local taxes. Garrett, supra at 66-67; Tramel, supra at 1315-16.
 
 
 16
 In Garrett we identified a broader purpose behind the Tax Injunction Act to embody the judicially developed limits on federal equity jurisdiction articulated in Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932). Before the passage of Tax Injunction Act, the Supreme Court in Matthews had held that federal courts would not grant equitable relief against the imposition of state taxes, even when challenged on federal constitutional grounds, as long as the state provided an adequate remedy. Garrett, supra at 67. Enactment of the Tax Injunction Act was prompted by the readiness of some lower federal courts to assert jurisdiction over state tax challenges despite the Supreme Court's admonition in Matthews. See 90 Harv.L.Rev. 616, 617 n.17 (1977). Congress and the Supreme Court deemed the comity principle inherent in 28 U.S.C. § 1341 especially important to avoid federal judicial interference with states' revenue raising operations and administration of their tax codes. Garrett, supra at 67, Quoting Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 298-99, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Tramel, supra at 1315-16. Recent decisions of the Supreme Court reaffirm the unique strength of the rule that federal courts will not entertain anticipatory adjudication which interferes with state and local tax administration if there is an adequate state remedy.[8] Steffel v. Thompson, 415 U.S. 452, 472, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Lynch v. Household Finance Corp., 405 U.S. 538, 542 n.6, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); Perez v. Ledesma, 401 U.S. 82, 126-28 & n.17, 90 S.Ct. 2234, 26 L.Ed.2d 790 (1971) (Brennan, J., concurring in part and dissenting in part).
 
 
 17
 Against the backdrop of the purposes of the Tax Injunction Act and the policies of federal equity practice, the Holmes opinion, relied on by the plaintiffs, is plainly inapposite. In Holmes the Pennsylvania Supreme Court was not concerned with intrusive federal suits but, rather, with applying a state doctrine of municipal immunity from the bar of state statutes of limitation. The effect of the Holmes court's classification of the City's ordinance as a rental, rather than a licensee fee or a tax, was to bring the statute of limitation bar down on an action by the City to recover uncollected moneys over a 20-year period. The policies at stake in Holmes were those of repose and sovereign immunity, not the comity objective of restraining federal courts from interfering with state revenue raising. 353 Pa. at 278-81, 6 A.2d at 887-88. Thus, the state court's label of the City ordinance as a rental, not a tax, need not control our construction of the Tax Injunction Act in this case.[9]
 
 
 18
 City ordinance § 9-303(4)(a) is a revenue raising measure collected annually in a manner similar to other gross receipts levies. From the record it appears that moneys collected are added to the public fisc, rather than applied exclusively to contractual services owed central alarm station companies. Anticipatory federal adjudication will clearly interfere with the City's collection of its revenues. Hence, we believe § 9-303(4)(a) is a "tax" within the meaning of 28 U.S.C. § 1341. Accordingly, the Tax Injunction Act bars the plaintiffs' suit if they are afforded a "plain, speedy and efficient remedy" by state law.
 
 II.
 
 19
 Garrett v. Bamford, supra, teaches that the "plain, speedy and efficient remedy" requirement of the Tax Injunction Act is no more stringent than the judicially developed equity standard for the "adequacy" of state remedies. Moreover, if the availability of the state remedy be merely uncertain, it is inadequate. 538 F.2d at 67. See Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 605, 71 S.Ct. 508, 95 L.Ed. 573 (1951); Township of Hillsborough v. Cromwell, 326 U.S. 620, 624, 66 S.Ct. 53, 90 L.Ed. 415 (1946); Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105-06, 65 S.Ct. 152, 89 L.Ed. 101 (1944); Hart and Wechsler, Supra note 7, at 978-79. We must review the adequacy and availability of legal and equitable relief afforded the plaintiff-taxpayers in state court by way of direct action or on an appeal from an administrative proceeding.
 
 
 20
 The Philadelphia Code offers taxpayers two avenues of administrative relief. Section 19-1702 authorizes individuals to petition the Tax Review Board for review of the Department of Collections' determination that the taxpayer has incurred liability on Unpaid taxes.[10] Alternatively, the taxpayer may pay the challenged tax and petition the Department of Collections for a refund pursuant to § 19-1703. Refunds may be sought for amounts "paid under mistake of law or fact, or under an invalid law."[11] Grants or denials of refunds are reviewable by the Tax Review Board. Philadelphia Code §§ 19-1703(4), (7). There is no dispute in this case that amounts levied under § 9-303 of the Philadelphia Code are reviewable administratively under both sections 19-1702 and 19-1703.[12] Section 19-1706 of the Philadelphia Code authorizes taxpayer appeals from adverse decisions by the Tax Review Board in either a deficiency or refund action to be taken to any court of competent jurisdiction. See City of Philadelphia v. Kenny, 28 Pa.Cmwlth. 531, 545-46, 369 A.2d 1343, 1351, Cert. denied, 434 U.S. 923, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). In Non-Resident Taxpayers Ass'n v. Municipality of Philadelphia, 478 F.2d 456, 458 (3d Cir. 1973), this court held that these same provisions for resort to the City of Philadelphia's Tax Review Board, followed by appeal to the state court, constituted a plain, speedy and effective remedy, barring a federal equity action pursuant to § 1341. See also City of Houston v. Standard-Triumph Motor Co., 347 F.2d 194, 199 (5th Cir. 1965), Cert. denied, 382 U.S. 974, 86 S.Ct. 539, 15 L.Ed.2d 466 (1966). The Non-Resident Taxpayers case upheld the dismissal of a federal injunctive action challenging the right of the City of Philadelphia to impose a wage tax on nonresidents of the City employed in a federal enclave within the City's limits.
 
 
 21
 On their face the City of Philadelphia Code's provisions for administrative action and subsequent judicial review are plain, speedy and efficient remedies adequate to bar a taxpayer's initial resort to a federal equity action. However, the plaintiffs contend that the remedies available to them are virtually identical to those held inadequate to bar a federal equity action in Garrett v. Bamford. There is no inconsistency between our court's decisions in Non-Resident Taxpayers and in Garrett. The circumstances which rendered administrative action and judicial review inadequate in Garrett were not present in either Non-Resident Taxpayers or in this case. Plaintiffs' efforts to analogize their position to that of the taxpayer-suitors in Garrett are not convincing. In short, we believe Garrett's conclusion of an inadequate state remedy is inapposite to this appeal.
 
 
 22
 In Garrett, residents of a predominantly non-white area of Berks County, Pennsylvania, brought a class action in federal district court claiming that the county's method of assessment was racially discriminatory, in violation of 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment. The district court dismissed the claim for equitable relief. We reversed and held that the available statutory review of administrative proceedings was not a plain, speedy and efficient remedy in those cases where "plaintiffs allege systematic and intentional class-based racial discrimination in tax assessments . . . ." 538 F.2d at 72.[13]
 
 
 23
 In Garrett property taxpayers had available to them a statutory remedy of an action before the local Board of Assessment Appeals, followed by state judicial review of an adverse decision by the Board. This court noted two substantial inadequacies with this remedy for the particular plaintiffs before us in that case. First, the taxpayers were challenging an area-wide pattern of discrimination, rather than individual assessments. However, state law apparently did not permit a class action in state court unless all class members had exhausted their administrative remedies. Such an exhaustion requirement was prohibitively expensive for many of the low income class members who would have had to appeal individually to the Board of Assessment Appeals and present costly expert testimony as to fair market values. Second, the statutory procedure for review of assessments was tailored to providing relief only for One tax year. In light of plaintiffs' allegations of systematic and intentional discrimination, there was a prospect for repetitive constitutional violations. The plaintiff taxpayers would have been forced to bring successive challenges to individual assessments year after year. By contrast to the protracted proceedings made necessary under the state's statutory remedy, a federal equity court could issue a continuing injunction, effective for the entire class, precluding the need for a multiplicity of suits by each taxpayer over a period of time.[14]
 
 
 24
 In this case there is simply no comparable inadequacy in the state's statutory remedy, for there is no prospect of multiple suits, either by similarly situated property owners or in successive suits each year. In Garrett we emphasized that the crux of plaintiffs' challenge was to the method of assessment, rather than the levy of the property tax itself. In this case, each of the five central alarm station companies challenge the validity of § 9-303(4)(a). The crux of their challenge is to the alleged discrimination between central alarm station companies who are taxed on their gross receipts and all other purchasers of Bell of Pennsylvania's services who are not taxed on their gross receipts. Such a claim of discrimination does not require factual inquiry into each individual's property values or the systematic method of assessment. Nor is there occasion for proof of intent from systematic discrimination. Plaintiffs' equal protection arguments turn solely on the "minimum rationality" of the City's classification of central alarm station companies as distinct from other purchasers of Bell's services who, of necessity, use underground wires.[15] The constitutional core of plaintiffs' complaint may be effectively litigated by one company in state court for the future benefit of all central station alarm companies. A decision by the Tax Review Board or the state courts in any single proceeding or suit that § 9-303(4)(a) is invalid will bind the City and accomplish all the relief sought by the five central alarm station companies.
 
 
 25
 We conclude that the central alarm station companies are not in the same position as were the plaintiff-taxpayers in Garrett v. Bamford. In this case the plaintiffs have a plain, speedy, and efficient remedy at state law with which to resolve their complaint that § 9-303(4)(a) unconstitutionally deprives them of equal protection.
 
 
 26
 Finally, the plaintiffs contend that the statutory remedies available to them have not proven plain, speedy or efficient in practice. From the record it appears that only one of the five central alarm station companies, Robinson Protective Alarm Company (Robinson), has resorted to the administrative process. In January 1972, Robinson filed a petition for refund covering payments made under § 9-303(4)(a) for the period December 1965-December 1971. Since December 1971, Robinson has refused to pay any amounts collectible under § 9-303(4)(a) on the ground that the ordinance is unconstitutional. By March 1977, when the five central alarm station companies filed their complaint in federal district court, the Tax Review Board had not taken action on either Robinson's refund or its delinquency suits. There is no evidence in the record to indicate that Robinson's situation represents anything more than an isolated occurrence of delay attributable to both litigants. In the absence of any evidence in plaintiffs' affidavits or other submissions that other taxpayers have been disadvantageously delayed in pursuing their administrative remedies, we decline to infer from this litigation by one taxpayer that the statutory remedies available to City taxpayers which are adequate on their face are not generally adequate in practice.
 
 III.
 
 27
 The district court's dismissal of the plaintiffs' complaint will be affirmed.
 
 
 
 [1]
 In § 9-303(1)(c) "private alarm signal system licensees" are defined as central alarm stations which have obtained a special ordinance granting them the privilege of using underground wires
 
 
 [2]
 The five plaintiffs are Robinson Protective Alarm Co., Wells Fargo Alarm Services, Honeywell Protection Services, Burns Electronic Security Services, Inc. and Sheppard Alarm Co., Inc. As of the time of their complaint, Sheppard Alarm Co., Inc. was in the process of applying for a special ordinance to conduct its business in compliance with § 9-303. The other four plaintiff-companies operated pursuant to the terms of valid special ordinances granted each of them. In this opinion, all five plaintiff-companies will be referred to collectively as the central alarm station companies
 
 
 [3]
 The complaint also named as defendants four City officers charged with enforcement and collection of moneys under § 9-303
 
 
 [4]
 In particular, the complaint requested the following: declaratory judgments that § 9-303, as applied to plaintiffs, violated the Fourteenth Amendment of the United States Constitution, Article VIII, Section 1, of the Pennsylvania Constitution, and the Sterling Act; an injunction barring the City's enforcement of § 9-303 against the plaintiffs; and refund of all sums paid by plaintiffs pursuant to § 9-303 within the past six years
 
 
 [5]
 The plaintiffs do not contend that suits which couple requests for declaratory and refund relief with a request for an injunction are beyond the scope of the Tax Injunction Act. The fact that plaintiffs' complaint seeks forms of relief comparable to an injunction in their interference with state and local tax administration renders this suit within the possible reach of the Tax Injunction Act. See Kelly v. Springett, 527 F.2d 1090, 1094 (9th Cir. 1975) (§ 1341 applies to suits for refunds as well as to anticipatory relief); 28 East Jackson Enterprises, Inc. v. Cullerton, 523 F.2d 439, 440 n.2 (6th Cir. 1975), Cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (§ 1341 applies to complaint which joins requests for injunctive relief with damages and a declaratory judgment). See also Perez v. Ledesma, 401 U.S. 82, 127 n.17, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part); Township of Hillsborough v. Cromwell, 326 U.S. 620, 623, 66 S.Ct. 445, 90 L.Ed. 358 (1946); Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 299, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943) (Court pretermitted applicability of Tax Injunction Act and denied declaratory judgment on traditional grounds of equity court's discretion)
 Plaintiffs also do not contest the rule that the Tax Injunction Act's withdrawal of subject matter jurisdiction equally applies when the complaint invokes jurisdiction over a federal constitutional question under 28 U.S.C. § 1331(a) as in a diversity case under 28 U.S.C. § 1332(a). See Bland v. McHann, 463 F.2d 21, 24-25 (5th Cir. 1972); American Commuters Ass'n v. Levitt, 405 F.2d 1148, 1150-51 (2d Cir. 1969); Kistner v. Milliken, 432 F.Supp. 1001, 1004 n.3 (E.D.Mich.1977). Cf. Tully v. Griffin, 429 U.S. 68, 73, 97 S.Ct. 219, 50 L.Ed.2d 227 (1976); Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 470-75, 96 S.Ct. 1634, 48 L.Ed.2d 96 & n.14 (1976) (§ 1341 does not bar Indian tribe from suing under 28 U.S.C. § 1362 if United States could have sued on their behalf).
 
 
 [6]
 Tramel stated that often state classifications of revenue raising measures depended on the use to which the revenue would be put. Such distinctions as to use were deemed not relevant to the congressional purpose of comity underlying the Tax Injunction Act which was primarily directed to precluding federal judicial interference with the collection of the revenues, regardless of use. 505 F.2d at 1314-16
 
 
 [7]
 For excellent scholarly summaries of the general practice of congressional incorporation of state law and its implications for jurisdictional purposes, see P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 491-94, 768-70 (2d ed. 1973); A. von Mehren & D. Trautman, Law of Multistate Problems 1049-1058 (1965)
 
 
 [8]
 Garrett, supra, concluded as follows:
 "(A)s a general rule, injunctive or declaratory relief against state taxes can be sought in federal court only when the forums provided by the state are inadequate to the task."
 538 F.2d at 67.
 
 
 [9]
 In the different context of the Travel Act, 18 U.S.C. § 1952, the Supreme Court declined to mechanically adopt state law labels of covered crimes even though the federal statute expressly incorporated state law. In United States v. Nardello, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), the Court defined crimes covered by the Travel Act not by strict regard to state classification but by reference to the congressional policies of the Act
 
 
 [10]
 Section 19-1702(1) reads in full:
 "(1) Every petition for review of any decision or determination relating to the liability of any person for any unpaid money or claim collectible by the Department of Collections including, but not limited to, any tax, water or sewer rent, license fee or other charge, and interest and penalties thereon, shall be filed with the Tax Review Board within 60 days after the mailing of a notice of such decision or determination to the petitioner."
 
 
 [11]
 Section 19-1703(1)(a) reads in full:
 "(1)(a) The Department of Collections may grant a refund, in whole or in part, upon determination that a tax, water or sewer rent, license fee or other charge, interest or penalty, or any part thereof, has been paid under mistake of law or fact, or under an invalid law."
 
 
 [12]
 A plain reading of §§ 19-1702 and 19-1703 makes clear that amounts payable under § 9-303(4)(a) may be challenged by way of either deficiency or refund actions. Even applying the Holmes decision's labelling of the levy on use of underground wires as a rental, such rentals are surely analogous to water and sewer rents explicitly covered in §§ 19-1702 and 19-1703. Furthermore, § 9-303(4)(b) makes amounts due collectible by the Department of Collections, bringing these charges within the express scope of §§ 19-1702 and 19-1703. As we emphasized in part I above, we may refer to amounts payable for use of the underground wires as taxes in the generic sense of 28 U.S.C. § 1341 even if they are not strictly labelled as taxes under the City's ordinances
 
 
 [13]
 Garrett also relied on the uncertainty of availability of state equitable relief for the plaintiff class. 538 F.2d at 68-70. The availability of a direct equitable action in state court may be in some cases an adequate remedy, but it certainly is not an exclusive source of an adequate state remedy. Thus, we need not determine in this case whether Pennsylvania equity courts would entertain a constitutional challenge to § 9-303(4)(a) without prior resort to the statutory remedy of administrative action reviewable in the Pennsylvania courts
 
 
 [14]
 Garrett concluded that under governing case law Pennsylvania equity courts would not issue an injunction in that case, involving, as it did, a challenge to the method of assessment rather than to the underlying tax statute. 538 F.2d at 68-70
 
 
 [15]
 In equal protection adjudication courts review economic classifications with only minimum scrutiny, in contrast to the strict scrutiny given racial classifications. Compare New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), and Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), With Regents of the University of California v. Bakke, --- U.S. ----, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Where state tax codes utilize classifications which are constitutionally suspect, triggering strict scrutiny, we may require greater certainty of the adequacy of the state remedy before closing the federal equity courthouse door. However, where state taxpayers' constitutional challenge necessitates only minimum scrutiny of the rationality of economic classifications, a somewhat less strict certainty as to the adequacy of state remedies may be sufficient. See Case Comment, "Racial Discrimination and The Tax Injunction Act: Garrett v. Bamford," 90 Harv.L.Rev. 616, 622-26 (1977). In this case plaintiffs' Fourteenth Amendment contentions require only minimum scrutiny by contrast to Garrett